Case No. 16-1111 Old Dominion Electric Coop v. FERC Ms. Clare for the petitioner, Ms. Chu for the respondent Ms. Clare for the petitioner, Ms. Chu for the respondent Good morning. Good morning, Your Honor. Adrian Clare for Petitioner Old Dominion Electric Cooperative v. ODAC. I've reserved two minutes for rebuttal. During January of 2014, the region covered by PJM Interconnection faced a polar vortex, which PJM itself described as the most challenging it had seen in its 87-year history. During that period, PJM made a number of emergency calls. One of those calls, or several of them, occurred for Old Dominion, which is where PJM contacted Old Dominion and asked it to purchase gas and produce electricity outside of the normal operating procedures. PJM supported Old Dominion's request for a waiver from the PJM tariff so that ODAC could be made whole because ODAC relied on PJM's assurances that it would be made whole when ODAC purchased gas in order to fuel its generating facilities. PJM supported that waiver request at FERC and advised FERC against the very confiscatory outcome that has happened in this case. Unfortunately for Old Dominion, no good deed goes unpunished. What's confiscatory when the contract itself Old Dominion to, that's the whole point of generation capacities. They obligated them to be, and were getting paid to be ready when called upon. That signal went up and they were supposed to respond. That's correct. What you just said, Your Honor, is correct, except that this happened in extraordinary circumstances where during the polar vortex units were supposed to be available, and this was in Old Dominion's answer, we said this, it's record document 28. Units have an obligation, generation capacity resources, have an obligation to be available. Old Dominion's units were available. Typically what has to be available is during the day ahead and then real time commitment and dispatch period. Typically isn't the limits, are limits of a contract obligation, what happens typically. I mean, you're not arguing force majeure here, right, that this actually displaces the contractual operation. That's correct, Your Honor, we're not. This is just, yeah, there's highs and there's lows, and there's ordinary days, but that's part of any long-term contract in energy markets and elsewhere. And this contract, by PJM's own admission, this contract, the tariff obligation for a generation capacity resource did not obligate Old Dominion in having to be available, did not obligate Old Dominion to have to be available after the day had closed and then have its units committed, which is when this all occurred. I would also point out, Your Honor, that that is not the basis of FERC's rejection of the waiver. Well, but your position was all along that there's nothing in the contract that authorizes these payments. So those are nothing, right, what you're seeking here is not, the equitable relief you're seeking here is not something that the contract itself permits. That's right, Your Honor. As the Court has recognized, waivers are usually for some exception from what the tariff specifically provides. That's correct. However, what we're doing is doing this exact analysis that Your Honor is, whether or not this circumstance satisfied the waiver criteria. What the Commission did is rejected Old Dominion's waiver request on the basis of the file rate doctrine and retroactive rate making. That is the error that we're seeking relief from the Court from. The merits of ODEX waiver requests is exactly what we believe the Commission should have looked at, and they failed to do that. Contrary to their precedent, we had 67 cases that we attached to a petitioner's opening brief. In three of those cases, only three out of the 67, each of those 67 cases dealt with retroactive waiver requests. In three of the 67, those were the only ones we could find where the Commission did not undertake its waiver analysis, and those three are the three that dealt with the polar vortex, the Duke case, which you're hearing today, and then the New Jersey Energy Associates case that has not come up for appeal. In every other case that we could find where there was a retroactive waiver request and the Commission didn't refute this in its brief, every one of those cases the Commission went through the waiver analysis. And so the error that the Commission made is departing from that precedent without any reasoned decision. In their first order, denying the re-hearing – I mean, excuse me, the petition – So why – excuse me, but why would the Commission have to go through that process if there was, in fact, a violation of the file rate doctrine? Your Honor, in other cases where there had been arguments about whether or not there was a violation of the file rate doctrine, such as the California ISO case, the Commission nevertheless went through and made the waiver analysis. I'd like to address whether or not – But, excuse me, if there's a violation of the file rate doctrine, isn't that the end of the analysis? We don't believe that there was a violation of the file rate doctrine. I understand you don't believe it, but if there was, if the Commission believed here, why would it have to go on and look any further? Isn't that the end of the case? We don't believe so, Your Honor, because in the other cases where the Commission – Explain to me why I'm wrong, logically. If there is, as FERC found here, a violation of the file rate doctrine, why doesn't that end the matter? If there was a violation of the file rate doctrine, Your Honor, we agree, there would no – Okay, so – okay, excellent. So then the question before us is whether FERC was right that the waiver would have produced a violation of the file rate doctrine. That's the question for us. I would submit, Your Honor, there are two questions. First, whether or not FERC was right, and I would like to answer that question. But then also, what we complained of is that the Commission, in similar circumstances, consistently has undergone the waiver analysis in any event. Turning to the first question – I'm sorry, just real quickly. How many of those cases predated Columbia Gas? Or, Columbia S3, I guess. I think they post-date. All of them were after 2002, I think, Your Honor. I'd have to go back and look at the appendix. On the issue of notice – and it starts at A16. I just don't have it here, Your Honor. I could check if you'd like. No, no. Go ahead with your point. Thank you. On the issue of the file rate doctrine and prior notice, the Commission determined that the file rate doctrine prevented – and the rulings are attracted to rate-making – prevented – prohibited the Commission from granting ODEX waiver requests. However, there was sufficient – we believe there was sufficient notice provided in this case for a few reasons. First, these are market-based rates, not a stated rate like was at issue in the Columbia Gas case, but a market-based rate. Excuse me. Isn't there an offer cap? For one of the – yes, Your Honor. There was a $1,000 offer cap. Right. And that would have been exceeded correctly, right? It would have, Your Honor, except that – Okay. So – and that's not a formula-based rate. That's just a flat offer cap. The offer cap is a flat offer cap. Yeah. In Old Dominion circumstances, however, Your Honor, there was a – PJM gave notice on January 21st of 2014 to all of its stakeholders and rate payers. Now, let me – I want to ask you about that – that document. This is – this is at Joint Appendix 137. It says – it says, Notice to Market Participants. Right? Who are they? Market participants would be anyone participating in the PJM markets. It includes rate payers, generators, transmission providers, sellers of energy, purchasers of energy, and capacity. Does that include, like, you know, home buyer – people in their houses? I'm sorry, Your Honor. Customers? Does that include customers? You know, people – It does include customers, Your Honor, as they are market participants. I don't know if I would – Okay. So how – explain to me how a notice on their website is sufficient to provide the required – the Columbia Gas required notice to customers. This wasn't published. This wasn't filed with BERG. It was just put on their website, right? That's right, Your Honor. We're offering – How is that sufficient notice for customers? It was that – Customers are supposed to know what's on the – is – are customers supposed to know what's on the PJM website? Yes, Your Honor. Old Dominion – What? Old Dominion is a customer under PJM tariff, is a market participant, and pays attention to these BERG notices. It's the way that PJM – it's the exact same way that PJM would notice emergency circumstances, such as the polar vortex. That's the mechanism for parties to understand, including customers, to understand issuances from PJM – But do you mean – who do you mean by customer there? In this instance, the customers were those who were purchasing energy and capacity in the PJM markets. And is that a homeowner? That is not a homeowner, Your Honor. Load-serving entities such as Old Dominion purchase on behalf of these in-use customers. Turning back to notice – I want to get back under your – I'll go ahead and finish your notice point, and then I'll come. Thank you, Your Honor. The first was that this is a market-based rate, not a stated rate. Well, that's the one I wanted to respond to. Thank you. So if it's a market-based rate, and your theory is that – That's right, Your Honor. And so here we have an unusual up in the rate, and we're entitled to compensation. Does that mean if there's an unusual down, you guys are making far more money, everything's a lot cheaper than you ever thought, that you then – customers are entitled to a rebate? Or is this a one-way? It is not one-way, Your Honor. However, I think that there is – Has it ever happened? The nose is – not to my knowledge. There have been times, Your Honor – I shouldn't say that. There have been times where I'm sure that rates have been adjusted downward. There have been tariff – there have been waivers, some of the 67 cases, and I can't say which one. There have been waivers where the Commission has noted the effect of a waiver is to cause prices to go down. It was the California ISO case. The effect of the waiver that the Commission granted resulted in a price reduction. That was one of the things that the Commission looked to, to grant in favor of the waiver. So on the issue of notice, in addition to the fact that this was a market-based and not a stated rate tariff, customers were also put on notice by that January 21st notice issued by PJM. I would note that that January 21st notice did only speak to above-a-thousand-dollar offer cap. It was in advance of Old Dominion's above-a-thousand-dollar date because that happened for Old Dominion on January 21st and 22nd. And then also the PJM tariff has a provision that states that PJM is able to take emergency measures in order to preserve reliability. And that's what PJM did here in the context of the polar vortex. So for us, from Old Dominion... Who pays? If you were to win, where does this money come from? If we win first from PJM, and then ultimately PJM will recover that from its shareholders and rate payers, including Old Dominion incidentally. And the evidence that those folks had notice that they were going to have to cough up... I forget, but it's a large amount of money. It's $14.9 million, Your Honor. Was the nature of the market rates? It was the nature of the market rates. It's all of these. So it's the market-based rate, the fact that we were in emergency circumstances, and PJM is authorized to take extraordinary measures. Why isn't the cap... To follow up on Judge Tatel's question, it's a market-based rate that is capped. Yes. So that's an assurance to customers that however it moves, it's never going over this. And now it's going over this. For the above $1,000, Your Honor, it is because on that above $1,000, PJM issued notice saying that it was going to seek a waiver for a cost above $1,000. Well, to seek, that doesn't mean they've got it. That doesn't tell me that I'm going to have to pay over $1,000. We would say, Your Honor, that that gave customers notice. PJM said that it was going to ask for exactly that. PJM subsequently... Was it going to ask for something? Counsel's notice that your contractually agreed-upon rate is gone as of that day? No, not that I'm aware of, Your Honor. Not that I can tell you, but standing here today. Because we believe there was not a notice violation, however, we don't believe that the Commission was right in ruling against the waiver, summarily dismissing the waiver, excuse me, on the basis of the file-break doctrine of the rule against retroactive rate-making. The Commission, in its orders and in its... I apologize, I thought Judge Tatel had a question. The Commission, in its orders below and in its briefs here, cited a number of cases and said, essentially, that the cases that Old Dominion has presented where the Commission repeatedly undertook the waiver analysis, despite arguments against the file-break doctrine of retroactive rate-making, didn't apply here because they were mostly dealing with non-rate terms and conditions. That's actually a standard that we'd never seen before, but in any event, doesn't apply even for the cases that the Commission cited. There were three. There was an American Electric Power case that the Commission said dealt with non-rate terms and conditions. That actually dealt with waiver of a past period deadline, as FERC said in its brief, but that deadline dealt with submitting a study for an interconnection, which, had the waiver not been granted, the applicant for the waiver would have had to pay some part of $52 million of network upgrades. So, in our opinion, that's hardly a non-rate term or condition. Each of the other cases is the same. The Appalachian Power Company case, same thing. We have your argument. We'll give you back time for rebuttal, but thank you very much. Thank you. Good morning. Good morning. May it please the Court, Susanna Chu for FERC. I'm sorry. Following up on a question from Judge Tatel, the question before the Court is whether the Commission correctly found the filed-rate doctrine to apply on the facts of this case. And, as Judge Ouellette was pointing out, you can't have notice here on the basis of the PJM tariff. First, the PJM tariff expressly caps offers at $1,000 per megawatt hour. So, under the tariff, as it existed in January 2014, all customers expect that the costs of energy are going to be capped at this rate. And, in addition, let me back up a little bit. The offer cap only relates to about $3 million out of the $15 or so million that Old Dominion is seeking recovery for. The remainder of the $15 million actually relates to the fuel costs that they incurred to get their plants available and online, but the fuel wasn't actually burned because the generators didn't run. I get that the weather was really unusual. You have this system where generators are supposed to, sort of, a day in advance say, here's what we're ready to offer, and I take it PJM goes, okay, we think we're going to need this much, stand by. Does it happen pretty regularly that then, when the next day comes, we use some and we didn't use others? Or is it much more reliable? Like, if you call and say, I'm going to use your capacity, I can pretty much bank on you using my capacity so I can invest my resources. Your Honor, I'm not entirely sure, but I will say these were challenging circumstances. Usually... I'm just trying to understand how people think that if they get noticed that they offer their rate and they say, fine, we're taking you up on it, is it always used or is it... No, not always, and it's actually contemplated in the tariff. The tariff contemplates that sometimes PJM will dispatch generation units and then cancel that dispatch or cut it short. And under the tariff, if that happens, the gas that the generator purchased to respond to the dispatch instruction, that gas is not recovered, those gas costs are not recovered. Because gas costs are usually part of the generator's business decisions. It's a risk that's allocated to them. And in some cases, it's very beneficial. They may be able to purchase gas at very low prices in order to run the plants. And it turns out that the prices in the day-ahead energy market are very high. So it ends up being profitable for them. So as you were pointing out, Judge Ouellette, there are highs and there are lows in this market. And the tariff covers all of these situations. It's important to remember that Old Dominion actually concedes that there is no recovery under the tariff. So in order to get recovery, the court would have to find that there's no filed rate doctrine issue here. And it's permissible for the commission to go back and retroactively change these rates. So, Ms. Chu, could I take you back to the PJM, this January 21 statement? Could you just explain to us why that didn't give adequate notice? Sure, Your Honor. Well, first, to clarify, this only relates to the offer cap. So, again, it only relates to $3 million out of the 15. Relating to market participants. So with respect to the non-offer cap, there was no basis for notice at all. Is that your point? Yes, that's right, Your Honor. Okay. So this is what I see. Okay, so go ahead with respect to this, then. Why didn't this provide notice? So this was posted on PJM's website. And when you look at this, this is at JA 137, of course. At first, it seems to be a reminder to generators in Old Dominion's position that there are extreme weather conditions going on, but generators still have an obligation to offer into the markets, and they have an obligation to offer in subject to the $1,000 offer cap. So it's a reminder to everyone that they have to be online and they have to meet their obligations under the tariff. And secondly, this statement goes on to say that PJM will try to make these generators whole. It's recognizing that this is a situation where gas costs are very high, and it's possible that generators in Old Dominion's position will lose money. So PJM is saying that we'll try to make these generators whole, but this is, of course, no guarantee. In the Court's cases under the filed-rate doctrine, in the cases where notice has been found, there have been much stronger indications of notice. There have been decisions by this Court or orders by the Commission putting potential rate payers on notice that there may be a retroactive surcharge, but there's no such circumstance in this case. Well, when they say, well, it's a market rate, you should have known. Right, but the market rate cannot provide notice that rates are going to go up beyond the limitations. If there weren't a cap here, I know there is, but if you had a situation where there weren't a cap and it was a market rate, would that count as the type of notice of fluctuations that they want here or not? They say the market rate is sort of part of the notice. Right, well, Your Honor, no. The answer, I think, is no. There's an explicit cap here. No, I said if there weren't a cap. Oh, if there weren't a cap. Is the fact that market rate by itself, would a tariff that had just market rates as the term, would that qualify as one of those tariff terms that by its nature gives you notice that there's going to be fluctuations even this extreme? I don't think so, Your Honor, because in addition to the offer cap, there are also highly detailed provisions. This is, of course, a 3,000-page tariff, and there are very explicit provisions governing the kinds of costs that generators can recover under all kinds of circumstances. So, for example, a generator can clear the in-the-day-ahead market and receive compensation for that. A generator can be dispatched after the close of the market and receive compensation if it's dispatched by PJM and actually runs. And there are some costs that can be recovered if a generator is dispatched, but the dispatch is either canceled or cut short. But as Old Dominion concedes, the specific costs that they are asking for here are not covered under the tariff. They're not allowed under the tariff. So we would have to, after the fact, change the rules to allow the recovery. So, Your Honor, the Commission here was sensitive to the challenges facing all market participants during this time period, and it did everything in its power to address the market issues that arose. But in this particular circumstance where Old Dominion came to the agency five months after the events took place,  and it could not provide the relief that... Commissioner Moller relied on the MISA case. Can you tell me why Commissioner Moller was wrong? Yes, Your Honor. Commissioner Moller was, I believe, troubled by the equities of the circumstance. And as I indicated, the Commission in general was troubled by the equities. But Commissioner Moller was talking about the prior notice requirement under the Federal Power Act, which can be waived, the 60-day statutory notice requirement can be waived by the Commission. And here he was referring, he referred to the Midwest ISO case involving specific payments. That case involved an actual agreement between the system operator and the generation owner to provide compensation for a particular kind of program, for participation in a reliability program. Was that agreement in the tariff? I believe it was separate from the tariff. So, within that, he violated the... Why didn't that violate the file rate doctrine? Well, first, Your Honor, I will point out that this case was a 2013 case that predated West Deptford. And certainly, the Commission is... Probably State of Columbia passed three years ago. That's right. That's right. The Commission is especially sensitive to these issues after West Deptford, which was 2014. So, this Midwest ISO case, the Commission, in its rehearing order at paragraph 20, HAA48, actually found that rate payers may have had notice in this case. What was the source of the notice in that case? It may have been that the tariff provisions in that case contemplated rates for this particular kind of reliability service. And in that particular case, I believe the Commission actually determined that the tariff itself lacked sufficient detail to constitute a filed rate mechanism. And so, separate agreements had to be filed in order to provide the rates that were associated. And this separate agreement had been filed? Right. I believe so. Well, the agreement, I think it may have been filed late. I'm not sure, Your Honor, when it was filed. But it was an agreement that was contemplated by the Commission in a prior order, I believe. One last quick thing. What is the status of FERC's review of this? Because FERC decided to review this tariff after this event. Do you know what the status of that is? Oh, yes, Your Honor. FERC actually initiated at least two different proceedings or responded to two different proceedings relating to this. In one of them, I believe PJM has submitted compliance filings in response to the agency's orders. And I believe there is actually greater supply flexibility now to hopefully address this situation in the event it arises. Hopefully, generators will be able to better match their bids. The agency proceeding is so ongoing, I take it? I believe it might potentially be ongoing, but PJM has issued changes. And in addition, I'll also point out that the offer cap actually has been lifted from $1,000 to $2,000 under a Commission order in perhaps 2015.  Thank you very much. Thank you, Your Honor. Just a few points on rebuttal. On the issue of notice, there was an exchange with Judge Tatel and I believe also with Judge Millett about notice and which rate payers got it. I wanted to just remind, of course, that FERC can't effectively give notice to rate payers in their individual homes. FERC's jurisdiction is wholesale, not down to the retail level. And so these notices posted on the website and filings at FERC are the way that PJM, the wholesale entity, gives notice to the extent of FERC's jurisdiction. Ms. Hsu said that this notice that's on the website deals only with the offer cap, which is $3 million of what you're requesting. Is there any basis for notice with respect to everything else you're requesting? There is, Your Honor. What is that? The points that I made, which were we believe that the market-based rate nature of this tariff, the fact that it's not a stated rate at all and customers are aware that as demand and availability of resources fluctuate, so too will their prices. And then we also point to the fact that PJM has tariff provisions that allow it to take emergency measures, appropriate measures, excuse me, in emergency circumstances to preserve reliability. And then also, as Ms. Hsu said, although our claims, Old Dominion's claim, doesn't fit squarely within these provisions, there are provisions in the PJM tariff that allow for generators to be made whole beyond and above the market-based rate, and that's the start-up and no-load costs that were the subject of OREC's second claim. There were three categories, the above-a-thousand, the start-up and no-load, the cancel dispatch, and the curtail dispatch. And those provisions allow for recovery beyond the market-based rate, although the start-up and no-load costs, which is what Old Dominion sought a waiver of, we didn't fit exactly within start-up and no-load costs and asked to be made whole beyond that. One other point, there was a discussion about the MISO case, and Judge Millett, you asked what was the notice there, and this is covered in page 21 of our opening brief. In the MISO case, the tariff provision it issues specifically said that units, it was called an SSR unit, but units that were SSR units would qualify as long as they were subject to an executed agreement. There was not an executed agreement in place. FERC granted a waiver retroactively back because there wasn't this executed agreement. So again, FERC consistently, in all cases except for the three with respect to the polar vortex, made the waiver analysis, found that there was sufficient notice apparently, and still did that four-part analysis, which is what we're asking for here, not whether or not the merits of the waiver, and there were questions about, you know, aren't you obligated to sort of be here anyway? We believe that we did more than we had to do and, of course, satisfy our tariff obligations, but in any event, exactly that exchange is what we should have had with the Commission. The Commission stopped short by saying that waiver was prohibited by the fault rate doctrine and the Rule Against Retroactive Rate Making. Thank you. Thank you very much. The case is submitted.
judges: Tatel, Griffith, Millett